**PORT OF JACKSONVILLE MARITIME
AD HOC COMMITTEE, INC.,
Plaintiff,**

**v.**

**Admiral J. B. HAYES, Commandant, United States Coast Guard, Captain R. D. Hodges, Chief, Bridge Division, United States Coast Guard, Rear Admiral B. N. Stabile, Commander, Seventh District, United States Coast Guard, and the Jacksonville Transportation Authority, Defendants.**

**No. 79–444–Civ.–J–B.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Jan. 14, 1980.

---

**9.** In so concluding, we also absolve Captain Flint of nonstatutory negligence.

Thomas M. Baumer, Guy O. Farmer, II, Jacksonville, Fla., for plaintiff.

John E. Mathews, Jr., James E. Cobb, Jack W. Shaw, Jr., Robert S. Yerkes, Asst. U. S. Atty., Jacksonville, Fla., for defendants.

## OPINION

SUSAN H. BLACK, District Judge.

### I. Factual Background

Plaintiff in this action, Port of Jacksonville Maritime Ad Hoc Committee, Inc. ("the Committee"), seeks review of the issuance by defendant Admiral J. B. Hayes, Commandant, United States Coast Guard, ("Commandant"), of Bridge Permit 90–79 which authorizes defendant Jacksonville Transportation Authority ("JTA") to construct a bridge across Mill Cove and the St. Johns River at the Dame Point turn in Jacksonville, Florida ("Dame Point Bridge"). The bridge is to be part of the southeastern extension of State Road 9A which is to provide a high speed, limited access by-pass around the eastern edge of the core city of Jacksonville. The case is presently before the Court on the parties' cross motions for summary judgment.

This controversy is not new to the City of Jacksonville. Initial application for the permit was made on July 26, 1974, by Sverdrup and Parcel and Associates, Inc., consultants to JTA, and was completed on December 27, 1974. Public notice soliciting comments on the project was issued on January 22, 1975. The only response to this notice was by the Army Corps of Engineers which stated that the bridge would interfere with a proposed widened navigational channel. In response to the Corps' objections, JTA submitted revised plans in April, 1975, shifting the bridge alignment approximately 300 feet to the east. Though this shift satisfied the objections of the Corps of Engineers, certain maritime interests continued to object to the horizontal clearance of the bridge and the proposed location of the bridge piers. In response to these objections, JTA shifted the proposed bridge approximately 130 feet to the south, placing the south pier in approximately five feet of water. A revised application was submitted on March 3, 1978.

Once again the Coast Guard issued notice requesting public comments. Navigational interests, including the U.S. Navy, voiced objections to the vertical clearance of the bridge and to the placement of the piers. In response to these objections, JTA again submitted revised plans increasing the vertical clearance to 160.9 feet above mean high water ("MHW") at the center of the span and to 152.7 feet and 157.0 feet at the north and south edges of the channel respectively.

On August 11, 1978, the Coast Guard issued notice soliciting public comment on the latest revised plans. Numerous comments were received in response to this notice, and a public hearing was held on November 6 and 8, 1978. On July 2, 1979, defendant Stabile, Commander of the Seventh Coast Guard District, sent a report of his investigation, including his Findings of Fact, to Coast Guard Headquarters. He recommended that the permit be granted subject to certain conditions.

Thereafter, N. E. Mpras, Chief, Bridge Permits Division, prepared a Decision Analysis. He found that the record supported the District Commander's recommendation and recommended that the permit be issued. On July 11, 1979, Mpras submitted his Decision Analysis, and on the same day

the permit was issued by defendant Hodges, Chief, Bridge Division, by direction of the Commandant.

Plaintiff contends that the Commandant's decision must be invalidated on three grounds. It initially asserts that the permit is invalid because the Commandant failed to articulate the basis for his decision and the District Commander failed to make specific findings required by Coast Guard regulations. 33 C.F.R. § 115.60(d). It also asserts that the Commandant's decision was arbitrary and capricious. If the decision is not arbitrary and capricious, plaintiff asserts that it is invalid because the Coast Guard failed to conduct an independent vulnerability or other risk assessment study.

II. The Commandant's Failure to Make Adequate Findings.

Plaintiff contends that the permit is invalid because the Commandant failed to articulate the basis for his decision. It relies principally upon *Keenan Port of Dardanelle v. Siler*, No. LR–C–77–292 (E.D.Ark. 1979), in which the court required the Commandant to issue an affidavit specifically adopting the Decision Analysis as the basis of his decision. However, *Citizens to Preserve Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1972), makes it clear that such formal findings and conclusions are not always required. When the nature of the agency action is unambiguous, the Court should look to the administrative record. In the present case two official Coast Guard documents unambiguously state the reasoning of the Coast Guard in approving the permit; the District Commander's Findings of Fact and the Decision Analysis. In *Port of Dardanelle, supra*, these two reports conflicted, presenting the Court with an ambiguous record. Thus, the Court was required to insist that the Commandant, on the record, adopt the Decision Analysis as the basis for his decision.

In the present case the District Commander's Findings of Fact and the Decision Analysis are consistent in recommending that the permit be granted. Thus, the record is unambiguous, and the Court need not speculate as to the basis for the Commandant's decision. The Court shall base its analysis of the Commandant's decision to issue the permit on the reasoning of these documents and the full administrative record before the Commandant when he made his decision. If they rationally support the issuing of the permit, the decision of the Commandant must be upheld.

Plaintiff also argues that the permit should be invalidated because the District Commander failed to make specific findings required by Coast Guard regulations. 33 C.F.R. 115.60(d). Plaintiff alleges that the District Commander failed to make findings regarding the use of tows on the St. Johns River.[1] It claims that the Commandant could not adequately evaluate the bridge's horizontal clearance without such a finding.

An agency's failure to follow its own regulations can be grounds for invalidating its action. *U. S. v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). However, this is not necessarily the case. If the agency's omission has not prejudiced the plaintiff, its action may be upheld. *Pacific Molasses Co. v. FTC*, 356 F.2d 386 (5th Cir. 1966); *FTC v. Foucha*, 356 F.Supp. 21 (N.D.Ala.1973).

In the present case plaintiff has not been prejudiced by the District Commander's failure to make specific findings regarding tows. The record clearly indicates that tows were considered in determining the sufficiency of the horizontal clearance. R. IV, 8; R. I, 43, 44; R. XII A, 99–106. The study evaluating horizontal clearance and pier position included a consideration of the bridge's effect on tows as well as ships. R. XIII G, 121–147. As noted by the Supreme Court in *Citizens to Preserve Over-*

---

1. Plaintiff also alleges that the District Commander failed to make findings of the number of vessel trips passing the bridge site. However, the Commander's Findings of Fact, R. I, 43, refers to a report in the record which provides specific information concerning the number of vessel trips passing the bridge site. R. XII A, 71–73.

ton Park v. Volpe, supra, 401 U.S. at 419, 91 S.Ct. at 825, there is no need to remand to the agency for findings when "there is an administrative record that allows the full, prompt review of the Secretary's [Commandant's] action that is sought without additional delay which would result from having a remand to the Secretary [Commandant]." No useful purpose would be served by further delaying this project when it is clear from the record that the Commandant considered the point. This is particularly true when, as stated by counsel for JTA at the September 12, 1979, status hearing, costs of the project can escalate at the rate of $100,000 a day.

The Court has before it an administrative record which will allow a complete review of the Commandant's decision. Thus, the Court will proceed to a full and prompt review of that decision.

## III. The Rationality of the Decision.

### A. Standard of Review.

 The initial question in reviewing the merits of the Commandant's decision is determining the appropriate standard of review. All parties agree that the decision should be reviewed under § 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A):

The reviewing court shall—

> . . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . . . . .

The content of this standard was discussed in Citizens to Preserve Overton Park v. Volpe, supra. It is clear from Volpe that review should be based on the full administrative record before the decision maker at the time his decision was made. Id. 401 U.S. at 420, 91 S.Ct. 814. The Court must determine whether, based on the record, the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Id. at 416, 91 S.Ct. 814. See also, Bowman Trans. v. Arkansas-Best Freight, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). At oral argument, plaintiff concurred with the articulation of this standard offered by the Coast Guard defendants in their Response To Plaintiff's Motion and Brief Seeking Summary Judgment.

> [T]his Court must review the entire administrative record, and if, from that exhaustive review, it can discern a rational basis for the agency decision, even though another decision is possible, and all reasonable factors relevant to a reasonable decision are included in that record, the agency decision must be upheld.

Id. at 2.

Thus, if, after a review of the entire record, the Court finds that the Commandant considered all relevant factors and that his decision based on those factors was rational, it must uphold that decision.

Plaintiff basically alleges that the decision to issue the permit for the bridge as designed was arbitrary and capricious in three respects: the location of the bridge makes an already dangerous turn more dangerous; the piers are placed so as to create an unreasonable danger in navigating the bridge; and the vertical clearance is insufficient to provide for safe navigation of the bridge and to allow for the reasonably expected economic growth of the port. Plaintiff admits that there is evidence in the record on each of these points to support the Commandant's decision. However, it essentially argues that the evidence to the contrary is so overwhelming that, in light of the record as a whole, the decision was arbitrary and capricious. It is important to emphasize that the Court may not, and will not, attempt to balance the evidence. It must evaluate all the evidence in the record on each point raised by plaintiff, but as long as the Commandant considered all relevant factors and his decision was not a clear error in judgment the Court may not interfere.

## B. Location of the Bridge.

Plaintiff contends that the bridge, as proposed, is in an unreasonably dangerous location. It asserts that river bends are more dangerous than straightaways and that the Dame Point turn is even more hazardous still due to heavy currents. The District Commander specifically dealt with this problem and found that:

"No specific limitations to vessel traffic are expected to result from construction of the proposed bridge due to the fact that the structure is to be located in a bend in the river."

Record, Vol. I, p. 43 ("R. I, 43").

Plaintiff's position is supported by the record. Joseph Porricelli of Engineering Computer Optecnomics, Inc. ("ECO") testified that bridges both increase hazards and increase the consequences of an accident. He characterized a river bend as an accident enabling factor. Porricelli further testified that a structure constructed over a bend is twice as hazardous as one constructed over a straightaway. R. XII B, 100–111, 124–125. He also testified that a study conducted by ECO supported the contention that the bridge would increase the hazard of the turn by a factor of 1.73 for barges and 1.83 for ships. R. XII B, 112; XIII H, 26. The study was also introduced into the record. R. XIII H, 3–96. It concluded that "due to the presence of a bridge on Dame Point turn, one may expect an *additional* vessel (ship or towboat-barge array) accident, [sic] every 1.02 years . . . ." R. XIII H, 26. Plaintiff's position is also supported by a letter from Captain J. C. Hanson, captain of the port, to the District Commander, R. V, 72–76, as well as "Navigational Guidelines" for the Port of Jacksonville prepared for the Coast Guard by Captain Hanson. R. XIII K, 140–144.

Defendants do not deny that the bridge will increase the hazard to navigation in the area. They do dispute the degree of the incremental hazard and argue that the increase is not unreasonable. They cite testimony by John Leeper, vice president of Simot, Helliosen and Eichner, a transportation consulting firm, that the current at this point is not as strong as stated by plaintiffs. This testimony is supported by a study conducted by the Army Corps of Engineers. R. XII A, 110–113. The record also contains the report of an actual inspection of the current at this point by a Coast Guard Vessel R. V, 69–70. In addition, Gordon Sammis, a consulting naval architect, presented an additional study conducted using the Shows Model, a mathematical formula generally accepted as a valid method of determining horizontal clearance, which indicates significantly less hazard than that predicted by ECO. R. XII A, 105. Additionally, both the Leeper Study, R. XIII G, 97; R. XII A, 114–125, and an independent Coast Guard analysis, R. V, 78–80, question ECO's assessment of the danger of the turn and the increased hazard created by the proposed bridge.

The record further indicates that both JTA and the Coast Guard considered the availability of alternate locations which, for ecological, economic, or engineering reasons, were all considered less desirable. R. XIII G, 23–32. Thus, it is fair to say the wisdom of constructing the bridge at the Dame Point turn can be disputed. There is substantial evidence in the record to support the position of both parties. However, the Commandant clearly considered all relevant factors; the prevailing currents, the hazards of the turn, the increase in hazard due to the proposed bridge, and the feasibility of alternate locations. Based on the evidence in the record, the Commandant's decision to permit construction of the bridge at Dame Point was not a clear error in judgment.

## C. The Location of the Piers.

### 1. The South Pier.

Plaintiff's primary concern appears to be the location of the south pier. This pier is located on the outside of a bend in the river where the current is more rapid and apparently exerts some pull toward the outside of the curve. Discussing the location of the south pier, the Decision Analysis states:

The case file clearly shows that the south bridge pier, the pier that is of most concern to commentors, is on the straight portion of the river slightly east of the turn and located in less than 5 feet of water, therefore precluding interference with ship traffic . . .. The existing navigation channel width at the Dame Point Bridge location is 906 feet. The proposed bridge piers will not only clear the existing navigation channel, but provide for prospective navigation on the waterway by clearing a much wider possible future channel, as designated by the Corps of Engineers. The proposed bridge horizontal clearance of 1,250 feet between fenders will clear the possible future channel by 50 feet minimum on each side of the channel, and is 344 feet greater than the existing channel. The bridge abutments are sufficiently protected from collision. The proposed horizontal clearance far exceeds that of the existing bridges in the vicinity of the proposed bridge mentioned above. Most of those bridges are situated on alignments across riverbends similar to that of the proposed bridge.

R. IV, 12.

That conclusion is rational in light of the evidence in the record. Plaintiff does not deny that a ship may safely transit the bridge under ideal conditions. Instead plaintiff points to the unusual case in which a ship goes out of control and is swept upon the south bank by the prevailing current. Captain Hanson reports at least three such groundings in the vicinity of the proposed pier. R. V, 75. In addition Porricelli testified that an examination of the river bottom revealed that the bottom in this area is very soft and would not absorb sufficient energy to prevent a ship from running far enough aground to strike the pier. R. XII B, 117–120. His conclusion was supported by a report prepared by ECO. XIII H, 61–67.

Defendants cite the testimony of Robert Tapscott, executive vice president of George Sharp, Inc., a naval architectural firm, that any ship that draws more than 12–15 feet of water will run aground well clear of the pier. R. XII A, 88. Tapscott also testified that any ship that could safely transit a more severe curve downstream of Dame Point could safely transit the Dame Point turn. R. XII A, 87. This position is supported by a report prepared by Dan Becker, an engineer with Howard, Needles, Tammen and Bergendoff. R. XIII G, 45–46.

Once again the evidence is in dispute. However, it is not the province of the Court to second guess the Commandant as to which evidence is more reliable. Further, the mere fact that it is physically possible to strike the south pier does not require that the Commandant determine that its placement is contrary to the reasonable needs of navigation. The proposed pier is 200 feet from the present channel and 100 feet from the projected new channel. It has been moved so that it now will stand in approximately five feet of water. The Commandant's decision on this point is supported by the record and clearly is not arbitrary and capricious.

2. The North Pier.

The north pier is located 50 feet from the edge of the channel in approximately 38 feet of water. Testimony by Dan Becker, R. XII A, 64, and James E. Gast, vice president of Sverdrup and Parcel and Associates, Inc., R. XII A, 56, establishes that the natural currents at both flood and ebb tide will carry disabled vessels to the south, away from the pier. This conclusion also is supported by the Becker report. R. XIII G, 48–49. Plaintiff, however, complains that the pier will be located perilously near a turning basin used by ships calling on the Northside Station and the Blount Island Terminal. This is supported by the testimony of Captain George Moore, a pilot with substantial experience in the Port of Jacksonville. R. XII B, 85–94. However, the Coast Guard considered this objection and found:

The case record documents Coast Guard District investigation of the geographical location of vessel turning oper-

ations in the vicinity of Blount Island. Corps of Engineers response to Coast Guard inquiry shows feasible alternative vessel turning locations whose western limit of the turning circle is at least 700 feet east of the bridge site. (See Coast Guard letter dated 23 January 1979 to Corps of Engineers and Corps response dated 7 February 1979).

Decision Analysis, R. IV, 12.

This finding is supported by the record. R. III, 184. The Commandant could rationally determine that the advantages of the bridge warranted shifting the turning basin to another location. It is certainly not arbitrary and capricious to determine that such a shift could accommodate the reasonable needs of navigation.

## D. Vertical Clearance.

Plaintiff also asserts that the proposed vertical clearance of the bridge presents an unreasonable safety hazard and will unreasonably retard the economic growth of the Port of Jacksonville. It has presented a report by ECO raising the safety concern that ships may be unable to maneuver themselves so as to navigate the bridge at its highest point. R. XIII H, 51–60. In addition Vernon McDaniels, executive secretary of the Jacksonville Maritime Association, and David Howard, a marine journalist, testified about the possible adverse economic affect of the proposed bridge. R. XII B, 135–166. To counter this defendant JTA presented evidence of shipbuilding trends and comparisons of the proposed bridge with the vertical clearance limitations in competing ports. R. XIII G, 57–69, 88–96; R. XIII A, 1–52; R. XII A, 115–119. An analysis was also made of the effect the bridge would have had on ships which have called on Jacksonville in the past. It concluded that only four of seventy ships studied could not have navigated the 160 foot clearance. Two of those berthed downstream of the proposed bridge. R. XIII A, 1–52.

The Decision Analysis reflects that the Coast Guard dealt with the objections of the maritime community to the vertical clearance of the bridge. It concluded that, "The case record (see especially testimony of John H. Leeper on behalf of the Jacksonville Transportation Authority [R. XII A, 115–135]) adequately refutes these navigational objections." On the basis of the evidence in the record this conclusion is not a clear error in judgment.

## E. Conclusions.

The record contains conflicting evidence on every point raised by plaintiffs. However, it is the province of the Coast Guard, not the Court, to evaluate conflicting evidence. The record reveals, without question, that the Commandant considered all of the relevant factors. On the basis of the evidence before him, the Commandant did not make a clear error in judgment. Therefore, his decision was not arbitrary and capricious as that term is used in § 706(2)(A) of the APA.

## IV. Failure to Conduct an Independent Study.

Plaintiff's final contention, that the Coast Guard failed to carry out its responsibilities because it failed to conduct an independent vulnerability study, is without merit. As stated by the court in *Keenan Port of Dardanelle v. Siler*, No. LR–C–77–292, (E.D.Ark.1979).

"Just because the evidence for a given argument on one side is not persuasive to the administrative decision-maker does not mean that the agency has the duty to generate its own evidence on the issue when the evidence already produced on the other side appears, in the administrator's judgment, sufficiently complete."

*Id.* at 16, 17.

The Coast Guard received and considered voluminous evidence on each point raised by plaintiff. The record reveals it did not "sit passively and . . . make a determination based on facts presented to it," but actively evaluated and supplemented the evidence presented by the parties. On the basis of this evidence, the Commandant determined that the proposed bridge provided for the reasonable needs of navigation.

That determination is fully supported by evidence in the record and is, therefore, not arbitrary and capricious.

Therefore, the Court will this day enter an order entering Summary Judgment for defendants.